NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 4

No. 2019-253

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Criminal Division |
| | |
| Scott Miglorie Lafaso | June Term, 2020 |

Thomas A. Zonay, J.

Travis W. Weaver, Rutland County Deputy State's Attorney, Rutland, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua S. O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **COHEN, J.** Defendant Scott Miglorie Lafaso appeals multiple convictions following a jury trial. He argues that he was deprived of his right to a speedy trial under the Sixth Amendment to the United States Constitution and that the superior court erred in not excluding certain trial testimony from the jury's consideration. We affirm.

¶ 2. Defendant and complainant were once in a romantic relationship and lived together in Rutland, Vermont. After some time, defendant moved out and, following a period of intermittent contact, complainant ended their relationship. In September 2017, intent on renewing affections, defendant twice entered complainant's home without complainant's permission. On

the second occasion, defendant held complainant down, first on a couch and then on a bed, and grabbed complainant's phone out of her hand as she tried to call the police.

¶ 3. On September 11, 2017, the State charged defendant with burglary, unlawful restraint, stalking, interference with access to emergency services, and two counts of unlawful trespass.[1] Failing to make bail at arraignment that day, defendant was incarcerated pending trial. His first attorney soon filed a motion to withdraw, which the court granted. The court then appointed a public defender to represent defendant. That public defender herself successfully moved to withdraw, as did her replacement. A fourth and final attorney was appointed to represent defendant on November 27, 2017.

¶ 4. On January 8, 2018, defense counsel filed, and the court approved, a stipulated schedule agreeing to complete discovery by May 1 and to be ready for a one-day trial by June 1 of that year. On May 23, defendant filed a pro se motion to dismiss the charges, informing the court of his dissatisfaction with his continued incarceration and the repeated replacement of, and lack of information from, his lawyers. Defendant complained that he had "been robbed of [his] rights to speedy trial," and asked the court to "take action and protect [his] rights." The following day, the court scheduled the case for a jury draw on September 5, 2018. Then, on May 29, the court denied defendant's motion to dismiss under Vermont Rule of Criminal Procedure 49 because defendant was represented, and his attorney had not signed the motion. See V.R.Cr.P. 49(d) ("Every written motion, written notice or similar paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name . . . .").

¶ 5. On June 7, defendant filed a motion to review the status of counsel, which was followed by a docketed letter to the court where defendant described continued grievances with his lawyer and wrote, "I have been locked up now for over ten months, no weight of [the] evidence,

---

[1] Respectively, 13 V.S.A. §§ 1201(c)(3)(A), 2406(a)(3), 1062, 1031, 3705(d).

paper work, no lawyer calls. Nothing!" The court held a status conference on July 16, where defendant agreed to keep his attorney. At that status conference, defense counsel represented to the court that the parties had engaged in unsuccessful plea negotiations the previous month.

¶ 6. As scheduled, the court convened a jury draw on September 5, 2018, but no jury was drawn for defendant's case. The record reflects that the case was not reached because there was no trial date when defense counsel was available. A new jury draw was held on October 3, at which defense counsel stated that the parties were engaged in continued plea negotiations but agreed that if another case scheduled for October 16 were resolved, defendant's case would be tried that day. However, that same day—October 3—without explanation in the record, defendant's case was instead scheduled for a change-of-plea and sentencing hearing to be held on December 18. The record is similarly silent as to why that hearing was rescheduled for January 15, 2019, but the January 15 hearing was in turn rescheduled for January 28, this time the record indicating that defense counsel requested the change because he was unavailable on January 15.

¶ 7. At the January 28 hearing, defense counsel informed the court that the plea negotiations had been fruitless and the case would have to be tried after all. Defendant said the following at that hearing: "I've been in jail for eighteen months here. I would like to wrap this up. I'm trying to live my life here, not spend it all in jail here." When the court explained that the matter would be set for the next available jury draw, defendant protested: "Another time, so I'll be sitting another six, eight months in jail. This is ridiculous." The court scheduled the matter for a February 27 jury draw, when a jury was finally empaneled. Defendant received his trial on March 19, 2019, 554 days—just over eighteen months—after arraignment.

¶ 8. As expected, the matter was tried in one day, the evidence consisting of testimony from complainant and six other witnesses, as well as photographs and an audio recording. The jury returned guilty verdicts on all charges and the court later entered judgment accordingly.

¶ 9.    On appeal, defendant argues that the eighteen-month delay before trial violated his right to a speedy trial under the Sixth Amendment to the U.S. Constitution, warranting a reversal of the convictions and dismissal of the charges.  Defendant further argues that if the charges are not dismissed, he is entitled to a new trial because the superior court erred in not striking certain trial testimony, a matter we discuss more fully after examining the speedy trial claim.

## I.  Right to Speedy Trial

¶ 10.    The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  The speedy trial guarantee applies to the states by operation of the Due Process Clause of the Fourteenth Amendment.  Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  We begin our consideration of defendant's argument by outlining the purposes and characteristics of the speedy trial right, which inform and frame our analysis.  The right protects the interests of criminal defendants, including preventing oppressive pretrial incarceration, minimizing the anxiety and concern associated with pending criminal charges, and limiting the possibility that their defenses will be impaired.  Barker v. Wingo, 407 U.S. 514, 532 (1972).  The right also advances societal interests like reducing the inefficiency in the fair and accurate administration of justice stemming from backlogged court dockets, limiting the economic pressures caused by overcrowded pretrial detention centers, and safeguarding society from extended pretrial release of dangerous offenders.  See id. at 519-21.  Additionally, while some pretrial delay is appropriate—for example, to conduct discovery—delay can be used by both sides for inappropriate purposes, such as to erode an adverse witness's memory or cause the outright loss of evidence.  See id. at 521.  Finally, it is impossible to identify the precise point at which the speedy trial right is violated, and the only available remedy for its violation is strong medicine—dismissal of the charges.  Id. at 521-22.

¶ 11.    Given the purposes and characteristics of this "slippery" right, we are instructed to employ a balancing test, weighing relevant factors in the specific context of the case at hand.  Id.

4

at 522, 530. These factors include the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. at 530. These should be considered along "with such other circumstances as may be relevant," and no one factor is necessary or sufficient to find a deprivation of the speedy trial right. Id. at 533.

## A. Length of Delay

¶ 12. The length-of-delay factor serves two roles: First, because some pretrial delay is inevitable in criminal proceedings, to trigger examination of the other factors, the defendant must show "that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." Doggett v. United States, 505 U.S. 647, 651-52 (1992) (quotation omitted). Like the rest of the analysis, this threshold test is "dependent upon the peculiar circumstances of the case." Barker, 407 U.S. at 530-31. For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Id. at 531. Second, if the defendant makes this showing, we balance the length of the delay along with the other factors. State v. Reynolds, 2014 VT 16, ¶ 19, 196 Vt. 113, 95 A.3d 973.

¶ 13. Defendant has shown that an eighteen-month delay between arraignment and trial under the circumstances of this case triggers examination of the other factors. See State v. Turner, 2013 VT 26, ¶ 8, 193 Vt. 474, 70 A.3d 1027 (using arraignment as starting date). This was not a complex case. While multiple charges were involved, some of them felonies, they were all based on the same allegations from complainant. The trial, as expected, took only one day, and the evidence consisted of testimony from complainant and six other witnesses, photographs, and an audio recording. There were no co-defendants or expert witnesses, and there was no DNA or other forensic evidence. Accordingly, we move on to consider the other factors and weigh the eighteen-month delay in our balance. As a general matter, the eighteen-month delay for this relatively simple case weighs in favor of defendant.

5

B. Reason for the Delay

¶ 14. We turn to the reason for the delay in bringing defendant to trial. Valid reasons for delay, such as missing witnesses, justify a delay. Barker, 407 U.S. at 531. Intentional delays caused by the State to hamper the defense weigh heavily against the State. Id. More "neutral" reasons like negligence or overcrowded courts are less weighty but do weigh against the State because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Id. Other delays caused by the court have also been counted against the State. See, e.g., Vermont v. Brillon, 556 U.S. 81, 85 (2009) (explaining that delay caused by "trial court's failure to appoint replacement counsel with dispatch" may be attributed to State); Reynolds, 2014 VT 16, ¶ 22 (attributing to State, trial court's delay in scheduling status conference after mistrial). Delays caused by the defendant or defense counsel, whether retained or appointed, are attributable to the defendant. Brillon, 556 U.S. at 90-91.

¶ 15. Here, we must determine which party, if any, bears responsibility for the various components of the 554-day pretrial delay, and the weight assigned to the reasons for the delay. The first period we consider is between arraignment on September 11, 2017 and November 27, 2017, during which three defense attorneys moved to withdraw and a fourth was appointed. As defendant acknowledges, because this seventy-seven-day delay was caused by his attorneys, it is attributable to him. See id. at 92 (holding that delays caused by defense counsel's failure "to move the case forward" were not attributable to State).

¶ 16. We next consider the period between defense counsel's appointment on November 27 and defendant's pro se motion to dismiss on May 23, 2018. On January 8, 2018, defense counsel filed a stipulated schedule agreeing to complete discovery by May 1 and to be ready for trial by June 1. It is possible that counsel did not communicate the agreed timeline to defendant, causing the latter to file his pro se motion to dismiss. But the fact remains that the defense agreed to the pretrial timeline in the stipulation. We are presented with no evidence suggesting that

6

anything other than diligent preparation by both sides took place during this time. We accordingly attribute the period between November 27 and May 23 to the parties' need for discovery and general trial preparation. Thus, we do not count these 177 days against the State. See Turner, 2013 VT 26, ¶ 9 (observing that rules of criminal procedure, in particular V.R.Cr.P. 15(a), contemplate several months of discovery for felony cases and declining to weigh this period in favor of defendant); State v. Vargas, 2009 VT 31, ¶ 13, 185 Vt. 629, 971 A.2d 665 (mem.) (same); see also Reynolds, 2014 VT 16, ¶ 21 (holding that period that would have fallen within normal limits for trial preparation had it resulted in a verdict was "lost time" that could not be attributed to either prosecution or defense).

¶ 17. The next period under review is between May 23 and the September 5, 2018 jury draw, which the State argues is attributable to defendant because he filed multiple motions regarding his attorney during this time. See State v. Burke, 2012 VT 50, ¶ 16, 192 Vt. 99, 54 A.3d 500 (attributing delays caused by defense motions to defendant). Unlike in Burke, however, defendant's motions did not cause this delay. On May 23, defendant indeed filed his pro se motion to dismiss. But the very next day, the court scheduled the matter for a jury draw on September 5—over three months away. Then, on May 29, just six days after it was filed, the court denied the motion but did not reschedule the jury draw to an earlier date. Another defense motion followed on June 7 with a resolution on July 16, but still the matter was kept on the September draw. Defendant's motions are not to blame for the delay between May 23 and September 5. We attribute this 105-day delay to the court's scheduling needs and accordingly to the State. See Barker, 407 U.S. at 531 (holding that delays caused by overcrowded courts weigh against government because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant").

¶ 18. The court convened the jury draw on September 5, but no jury was drawn for defendant's case because there was no trial date when defense counsel was available. The twenty-

7

eight days between September 5 and October 3, when a new draw was held, count against defendant because of his attorney's unavailability for trial in September. See Brillon, 556 U.S. at 92 (holding that defense counsel's failure "to move the case forward" not attributable to State); State v. Windish, 590 N.W.2d 311, 316 (Minn. 1999) (declining to weigh delay caused by defense counsel unavailability against State).

¶ 19.    At the October 3 jury draw, defense counsel affirmed that the parties were engaged in continued plea negotiations but agreed to try defendant's case on October 16 if another case scheduled for that day were resolved. Instead, on October 3, without elaboration in the record, the case was set for a change-of-plea and sentencing hearing, scheduled for December 18.

¶ 20.    Seventy-six days are at stake between October 3 and December 18. Relying on authority from the U.S. Court of Appeals for the Second Circuit, defendant argues that because the delay was caused by plea negotiations, it weighs against the State. See United States v. New Buffalo Amusement Corp., 600 F.2d 368, 378 (2d Cir. 1979) (weighing one year of plea negotiations against government and holding that "[g]ood faith plea negotiations by a defendant should not be equated to a waiver of speedy trial rights, and, under the circumstances, the government must assume responsibility for the risk of institutional delays where the bargain ultimately is unsuccessful"); see also United States v. Tigano, 880 F.3d 602, 615 (2d Cir. 2018) (applying New Buffalo to weigh plea negotiation delay against government and adding that "time spent in plea bargaining is a gamble taken by the government regarding the defendant's speedy trial rights and is properly counted against the government").

¶ 21.    Other federal courts have not adopted this seemingly per se rule. See, e.g., United States v. Apicelli, 839 F.3d 75, 85-86 (1st Cir. 2016) (declining to weigh against government delay caused by defense counsel motions relating to plea negotiations and personal reasons); United States v. Sodano, 592 F. App'x 114, 116 (3d Cir. 2014) (declining to weigh against government continuances to pursue plea negotiations filed jointly by defendant and government); see also

8

Millard v. Lynaugh, 810 F.2d 1403, 1406 (5th Cir. 1987) (declining to weigh against government time spent in plea negotiations, though unclear whether negotiations were made in good faith). State courts seem to be equally divided. Compare State v. Samora, 2016-NMSC-031, ¶ 13, 387 P.3d 230 (N.M. 2016) (weighing plea negotiation delay against State and observing that "the possibility of a plea agreement does not relieve the State of its duty to pursue a timely disposition of the case" (quotation omitted)), with State v. Munoz, 991 S.W.2d 818, 824 (Tex. Crim. App. 1999) (en banc) ("We decide delay caused by good faith plea negotiations is a valid reason for the delay and should not be weighed against the prosecution.").

¶ 22.  We do not add our voice in this case to the ongoing debate of who bears the responsibility for good-faith plea negotiations in a speedy trial analysis because the record is too sparse for us to draw any conclusions on this issue.  Given the absence of a reviewable record, we attribute these seventy-six days of unexplained delay to the State based on Barker's holding that reasons like negligence or overcrowded courts weigh against the government because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Barker, 407 U.S. at 531; see also State v. Unwin, 139 Vt. 186, 195-96, 424 A.2d 251, 257 (1980) (attributing delay of unknown cause to State on this basis); McNeely v. Blanas, 336 F.3d 822, 827-28 (9th Cir. 2003) (weighing delay against government where record was unclear on reasons and citing cases).  Although we count these seventy-six days against the State, due to the sparsity of the record, we cannot assign this delay great weight.

¶ 23.  We move on to consider the remaining delays.  The record is silent as to why the December 18 change-of-plea hearing was rescheduled for January 15, 2019.  Again, we attribute these twenty-eight days of unexplained delay to the State.  The January 15 hearing was in turn rescheduled for January 28 at the request of defense counsel, who was unavailable on the 15th.  Thus, these thirteen days count against defendant.  At the January 28 hearing, defense counsel informed the court that the plea negotiations were unsuccessful and requested a trial.  The

9

remaining delay stemmed from the court's scheduling needs to hold a jury draw and set a trial date. We accordingly weigh the last fifty days between January 28 and March 19 against the State.

¶ 24. Even assuming the State is responsible for some aspects of the delay with respect to which the record is unclear, the State is only responsible for approximately 259 days of delay during the 554 days between defendant's arraignment and trial. We find no suggestion in the record that any of the periods of delay attributable to the State were deliberate attempts to delay trial in order to hamper the defense, limiting the weight we assign to those delays. See Barker, 407 U.S. at 531. Most of the pretrial delay is attributable to the withdrawal of several defense attorneys, the stipulated discovery and trial-ready schedule designed to accommodate the ordinary needs of trial preparation, and defense counsel's unavailability. The reasons for the pretrial delay do not weigh significantly in favor of defendant.

## C. Defendant's Assertion of the Speedy Trial Right

¶ 25. We next consider the defendant's assertion of the right to a speedy trial. Based on our analysis in Unwin, 139 Vt. at 196, 424 A.2d at 257, the State argues that this factor is "satisfied" only by a demand for an immediate trial. It maintains that because defendant only moved for dismissal, and never formally moved for an immediate trial, Barker's third factor does not weigh in defendant's favor. We clarify the law on this issue.

¶ 26. Barker held that "the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the [speedy trial] right." 407 U.S. at 528. Consistent with its instruction to undertake "a functional analysis of the right in the particular context of the case," id. at 522, Barker entrusts courts to consider the specific circumstances of the case under the third factor, such as a defendant's knowing failures to object to delays, defense counsel acquiescence in long delay, and "the frequency and force" of the defendant's speedy trial objections, id. at 528-29. There, the Court relied on several facts to hold that the defendant did not want a speedy trial, namely, a lack of action for several years, failure to

10

object to motions for continuances, and filing a motion to dismiss but not a motion for an immediate trial. Id. at 534-36. The fact that the defendant did not really want a speedy trial, combined with minimal prejudice, outweighed the "extraordinary" pretrial delay in that case. Id. at 533-34.

¶ 27. In accord with Barker's teaching to consider the specific circumstances of the case under the third factor, including the "the frequency and force" of the defendant's speedy trial objections, the analysis we undertook in Unwin and in subsequent speedy trial cases was to determine "the extent to which," or "the aggressiveness with which," the defendant asserted his right to a speedy trial—not whether the defendant "satisfied" the third Barker factor by filing a demand for immediate trial.

¶ 28. In Unwin, the defendant moved to dismiss without ever demanding an immediate trial. 139 Vt. at 196, 424 A.2d at 257. We observed that "[a] motion to dismiss based on an alleged violation of the right to a speedy trial is not the equivalent of a demand for an immediate trial." Id. In this and subsequent sentences, we merely distinguished a motion to dismiss on speedy trial grounds from a motion for an immediate trial and suggested that the latter is a stronger assertion of the right because a demand for immediate trial "would give the state the opportunity to promptly schedule a trial" and require that the defense be prepared to go to trial. Id. Although the analysis could have been clearer, Unwin weighed the absence of a motion for a prompt trial as one of the considerations bearing on how aggressively defendant asserted the right. It did not hold, as the State suggests, that failure to move for an immediate trial constitutes a per se failure to assert the speedy trial right. This is evident from the language we borrowed from United States v. Avalos, 541 F.2d 1100, 1115 (5th Cir. 1976), which held that where the defendants raised the speedy trial issue in a motion to dismiss but did not demand an immediate trial, the defendants did not "aggressively" assert their desire for a speedy trial. See Unwin, 139 Vt. at 196, 424 A.2d at 257 (quoting this language). It is further evident from the fact that we also considered other indications

11

of the defendant's desire for a trial in the form of discovery motions demanding the production of items from the State, which, we observed, also were not the equivalent of demands for a speedy trial. Id.

¶ 29. As we made clearer after Unwin, Barker's third factor is a matter of degree. Depending on other circumstances, one or multiple motions for an immediate trial may be a strong showing that a defendant asserted his right to a speedy trial aggressively. But more feeble actions by a defendant, like a motion to dismiss on speedy trial grounds or objections to continuances, may also show that the defendant asserted the right. See, e.g., Reynolds, 2014 VT 16, ¶ 24 (considering "the extent to which defendant asserted his right to a speedy trial," and holding that motion to dismiss weighed in defendant's favor, but not heavily); Turner, 2013 VT 26, ¶ 11 (considering "the aggressiveness with which . . . defendant asserted his right to a speedy trial," and holding that defendant did not aggressively assert right based on several facts, including filing one motion to dismiss, no demand for immediate trial, and no opposition to extensive discovery or counsel motion to withdraw (alteration in original) (quotation omitted)); Vargas, 2009 VT 31, ¶ 15 (considering "the aggressiveness with which . . . defendant asserted his right to a speedy trial," and holding that defendant did not aggressively assert right based on multiple facts, including filing one demand for speedy trial, opposing his counsel's motion to withdraw, and failing to take further action (alteration in original) (quotation omitted)).

¶ 30. Here, in considering the aggressiveness with which defendant asserted his right to a speedy trial, we accord some weight to defendant's motion to dismiss, his multiple complaints regarding the prolonged pretrial incarceration, and his expressed eagerness to expedite the proceedings. Defendant's failure to move for an immediate trial militates in the opposite direction, but it does not amount to an ipso facto failure to assert the right.

¶ 31. In his pro se motion to dismiss, defendant complained about his pretrial incarceration, asserted that he had "been robbed of [his] rights to a speedy trial," and asked the

12

court to "take action and protect [his] rights." Following his June 7 motion to review the status of counsel, defendant wrote a letter to the court complaining that he had been incarcerated for over ten months without sufficient information from his lawyer about the case. Later, at the January 28 hearing, he protested, "I've been in jail for eighteen months here. I would like to wrap this up. I'm trying to live my life here, not spend it all in jail here." When the court explained that the matter would be set for the next jury draw, defendant continued, "Another time, so I'll be sitting another six, eight months in jail. This is ridiculous."

¶ 32. Weighing strongly against these statements, however, is defendant's failure to move for an immediate trial. Defendant complained multiple times about how long the proceedings were taking, and we add these to our balance. But balancing those complaints with his failure to move for a trial or take other action, we cannot find that he aggressively asserted his right to a speedy trial. This factor does not weigh in favor of defendant.[2]

### D. Prejudice to the Defendant

¶ 33. Finally, we consider prejudice to the defendant. This factor is assessed in light of the defense interests the speedy trial right is designed to protect, including "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532. Prejudice to the last of these interests is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. However, "affirmative proof of particularized prejudice is not essential to every speedy trial claim." Doggett, 505 U.S. at 655. Moreover, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can

---

[2] Because we give defendant's motion to dismiss all the weight it is entitled to under the speedy trial analysis, we need not consider defendant's argument that the trial court erred in denying the motion on Rule 49 grounds.

prove or, for that matter, identify." Id. This presumptive prejudice "is part of the mix of relevant facts, and its importance increases with the length of delay." Id. at 656.

¶ 34. Here, defendant experienced some prejudice in being incarcerated for eighteen months prior to trial. He was doubtless disadvantaged by the restraints on his liberty and the anxiety and concern associated with pending criminal charges. We take this degree of prejudice into account, as well as the presumptive prejudice to the reliability of the trial stemming from eighteen months of pretrial delay. However, defendant does not maintain that his ability to defend himself at trial was impaired in a specific way, such as the loss of exculpatory evidence or witnesses or the erosion of a defense witness's memory. We faced similar facts in Turner and held that eighteen months of pretrial incarceration unaccompanied by demonstrated prejudice to the defendant's case or other showing of prejudice was insufficient for this factor to weigh in the defendant's favor. 2013 VT 26, ¶¶ 8, 13. The analogous circumstances of this case lead us to the same conclusion.

¶ 35. In sum, the only Barker factor significantly favoring defendant is the length of the pretrial delay. Under the circumstances of this case, defendant was not deprived of his Sixth Amendment right to a speedy trial.[3]

## II. Evidentiary Arguments

¶ 36. We turn to defendant's argument that he is entitled to a new trial because the superior court erred in not striking certain trial testimony from the jury's consideration. On direct examination, the prosecutor asked complainant to describe what occurred the first time defendant entered her house without her permission. As complainant was describing the incident, the prosecutor asked whether she called the police. When complainant answered in the negative, the

---

[3] Defendant filed a motion to strike certain portions of the State's appellate brief referencing material beyond the record on appeal. Because we do not rely on any material beyond the record in resolving defendant's speedy trial claim, defendant's motion to strike is moot.

prosecutor asked, "Why not"? Complainant answered, "I just—I—he's been in trouble, I didn't want him in any more trouble," adding, "I didn't want him to go to jail, just wanted him to go away." The prosecutor immediately returned to questions relating to the incident.

¶ 37. Later, on cross examination, defense counsel pursued a line of questioning regarding continued contact between defendant and complainant after defendant moved out of complainant's house. The following exchange took place between defense counsel and complainant:

> Counsel: So, in July or so, you're communicating with him about moving his remaining things [from complainant's house]?
>
> Complainant: Yeah, it was difficult to communicate with him in July.
>
> Counsel: Meaning you didn't have his phone number or just in talking to him? Did you have his phone number, for example?
>
> Complainant: Well, it was on State Street, up at the top of the hill there.
>
> Counsel: State Street? What was on State Street? I'm sorry. His phone number was on—
>
> Complainant: No, Marble Valley.

We take judicial notice that there is a penal institution in Rutland known as the Marble Valley Regional Correctional Facility. See V.R.E. 201(b). After complainant's reference to Marble Valley, defense counsel immediately returned to questions concerning the location of defendant's effects and their continued contact. In the same line of questions, complainant later testified: "It didn't matter if the week before I said to come to my house. But I said don't come in my fucking house, you don't come in my fucking house."

¶ 38. Defendant argues on appeal that complainant's statement that he had been in trouble before, her reference to time spent at Marble Valley, and her use of profanity were irrelevant to the issues at trial and accordingly should have been excluded under Vermont Rule of

15

Evidence 402. He also argues that even if these statements were relevant, they should have been excluded under Rule 403 because their probative value was substantially outweighed by the danger of unfair prejudice. He asks us to reverse the convictions and remand for a new trial.

¶ 39. Defendant acknowledges that he did not move to strike, object to, or seek a curative instruction for, any of the challenged testimony. Our review is thus only for plain error. See V.R.Cr.P. 52(b); V.R.E. 103(d). Plain error exists where "(1) there is error; (2) the error is obvious; (3) the error affects substantial rights and results in prejudice to the defendant; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." State v. Gauthier, 2016 VT 37, ¶ 10, 201 Vt. 543, 145 A.3d 833 (quotation omitted).

¶ 40. Even assuming obvious error, complainant's statements that defendant had been in trouble before and that he had spent time at Marble Valley do not rise to the level of plain error warranting reversal of the convictions. We have often cautioned trial courts to be vigilant against admission of a defendant's uncharged misconduct "because once jurors learn of uncharged misconduct, they tend to use an entirely different calculus of probabilities in deciding whether to convict." State v. Lawrence, 2013 VT 55, ¶ 18, 194 Vt. 315, 80 A.3d 58 (quotation omitted). Here, however, given the brief and vague nature of the statements, the strong evidence of guilt introduced at trial, and the trial court's general jury instructions, the references to previous misconduct and incarceration did not appreciably result in prejudice to defendant or seriously affect the fairness or integrity of his trial. Cf. United States v. Castano, 999 F.2d 615, 618 (2d Cir. 1993) (holding that two pieces of evidence of prior misconduct did not warrant reversal of convictions where introduction had been inadvertent, prosecutor did not emphasize statements, statements were ambiguous or cryptic, jury was ordered to disregard one of two pieces of evidence, and evidence of guilt was "overwhelming"); State v. Messier, 2005 VT 98, ¶ 21, 178 Vt. 412, 885 A.2d 1193 (finding no prejudice requiring reversal of conviction where, among other reasons, objectionable statement was "unsolicited and vague").

¶ 41. First, the statements were brief and ambiguous. The jury did not learn of any specific illegal act perpetrated by defendant. The prosecutor and defense counsel did not highlight or otherwise bring attention to the challenged statements. Indeed, they both immediately pivoted back to the events at issue. It is possible, moreover, that at least some jurors did not even know what Marble Valley referred to.

¶ 42. Second, the evidence introduced against defendant was strong. Complainant described in detail defendant's two unauthorized entries into her home. She testified that defendant let himself in the first time uninvited, and that on the second occasion she came home to find defendant there waiting for her. She testified that on the second occurrence defendant held her down on a couch for about fifteen minutes as she tried to free herself, that she succeeded in breaking free and grabbed her phone to call the police, that she went to a bedroom before defendant grabbed the phone out of her hand, and that defendant then held her down on the bed until complainant's mother entered the house and interrupted the exchange. Complainant further testified that the following day she saw damage on one of her doors and took a photograph of the damage, which was admitted at trial. She also testified that she and her brother later found a metal bar in her house of unknown origin, a picture of which was also admitted. Several parts of complainant's testimony were corroborated to varying extents by other witnesses, including her brother, her mother, two friends, and a police officer.

¶ 43. Third, although a curative instruction may have been warranted, the trial court's general jury instructions limited any potential prejudice that may have arisen. The court instructed the jury on its duty "to decide this case based solely on the evidence presented during the trial," later repeating that the jury had "to determine the facts from the evidence." The court instructed the jury that defendant was presumed innocent of the charges, that the State bore the burden to prove each of the essential elements of the offenses beyond a reasonable doubt, and that defendant could not be "convicted based on suspicion or conjecture." Under these circumstances, we

conclude that complainant's brief and vague references to defendant's prior misconduct and incarceration did not prejudice defendant or seriously affect the fairness or integrity of the trial.

¶ 44.    As regards complainant's use of profanity, the trial court committed no error, much less plain error.  On at least one occasion, we have held that a defendant was not prejudiced when the jury heard his own vulgar and profane language, observing that jurors "must be presumed to be able to avoid having profanity divert them from their duty."  State v. Davis, 132 Vt. 290, 294, 318 A.2d 664, 666 (1974).  Here, complainant's two uses of profanity were innocuous and as likely to harm her own credibility in the juror's eyes as they were to prejudice defendant.[4]

Affirmed.

FOR THE COURT:

_____
Associate Justice

---

[4] Given our disposition of defendant's evidentiary arguments on these bases, we need not consider the State's contention that defense counsel invited error in eliciting the profanity and the reference to Marble Valley, which would require us to determine that counsel considered the issue and made a deliberate choice, and not just failed through neglect to make a proper objection.  See State v. Alzaga, 2019 VT 75, ¶ 26, __ Vt. __, 221 A.3d 378 ("Invited error differs from plain error in that it bars review in situations where a party considers an issue and makes a deliberate choice, compared to plain error where a party fails through neglect to make a proper objection.").

18